## No. 14,394.

INTERNATIONAL SERVICE UNION ASSOCIATION v. MARTINEZ.

(86 P. [2d] 261)

Decided December 5, 1938.   Rehearing denied January 16, 1939.

MR. GRANBY HILLYER, for plaintiff in error.

MR. CHAS. H. WOODARD, MR. GEORGE H. BLICKHAHN, for defendant in error.

*En Banc.*

MR. JUSTICE YOUNG delivered the opinion of the court.

THIS action was instituted in the district court of Conejos county—the venue being changed to the City and County of Denver—by Fedelina Martinez against the International Service Union Association, a corporation, to recover judgment upon a death benefit certificate issued by it and in which she was named as the beneficiary. A

motion by defendant for a directed verdict was denied, and the trial resulted in a verdict and judgment for plaintiff, to reverse which the case is presented here by writ of error.

It appears from the record that the certificate was issued to Lucas Martinez, plaintiff's husband, and by its terms defendant agreed to and did insure the lives of the members of the family, one of whom was Lucas Martinez, Jr., the cause of action herein being based upon his death. The certificate contains, among other things, the following provision: "This certificate does not cover * * * death occurring while violating any criminal law." The defense is based upon the alleged fact that Martinez received the wound from which he died, while committing a criminal assault upon one Edward Garland.

The principal question presented by the assignments of error, a solution of which will be decisive of the issues here involved, is as to sufficiency of evidence to warrant the submission of the case to the jury upon the point of whether or not Lucas Martinez, Jr., at the time of his death, was violating a criminal law of the state, and as to whether the evidence in this particular was in substantial conflict. In this connection a resumé of the evidence seems desirable.

On the afternoon of October 6, 1936, one Ed Garland, who owned a ranch near the town of Antonito in Conejos county, in company with his nephew Jack Stewart had gone into town to engage a crew of men to harvest a crop of potatoes on his ranch. It was a stormy day, some snow had fallen, and due to the inclemency of the weather work on the ranch at the time was not practicable. A number of men were engaged who apparently were living at one of the cottage camps in the town. It seems that Garland on the previous afternoon was indisposed, being threatened with an attack of pneumonia, and, under the instructions of a doctor had gone to bed, remaining there until, under stress of getting his crop harvested in ad-

vance of freezing weather, he had gotten up on the 6th and gone to town for the purpose stated. He was dressed in a heavy overcoat. After hiring the men, he, in company with his nephew Jack Stewart, entered the general store of the Sargeant-Wood Mercantile Company. At the time there were a number of men, largely Spanish-Americans, including Lucas Martinez, Jr., standing about talking. Shortly after Garland entered, young Martinez, addressing the crowd generally and using a foul epithet, stated that he could "haul more spuds" than any —— present. Upon hearing the epithet Garland testifies that he said to Martinez "Who do you mean?" and that Martinez answered, "All of you." Whereupon Garland struck him with his fist, drew a revolver and attempted to hit him over the head with it. During the scuffle the gun was knocked from his hand and his nephew, Stewart, picked it up. Bystanders separated the two men and they shook hands and "called it off." Martinez stated, "Next time I see you you better have your thirty-eight. I am going to have mine."

It further appears from the record that Martinez was well known to Garland and that over a period of years from the time Martinez was old enough to work Garland had employed him on his ranch, on some occasions for several weeks at a time. After the fight Garland went to the rear of the store and talked for a short time with a Mr. Wood, one of the proprietors. While he was thus engaged a clerk talked with Martinez and asked him to leave so there might be no more trouble. Martinez in a few minutes left the store, which faced east on the street running north and south, and started north in the direction of his home. It appears that there are large plate glass windows in the store front, the main entrance being on the east and toward the southerly side; that there is another double door further north in a recess extending three or four feet back from the sidewalk, the double doors containing windows in their upper part. Garland testified that he saw Martinez leave the store. Shortly

thereafter he stated to his nephew Stewart that he thought it best for them to go home and they started to the northerly end of the store to leave through the double door. Mr. Lucero, the clerk who had persuaded Martinez to leave, testified that he had just let Martinez out the front door and, as he went back to the north storeroom, heard Garland say to Stewart: "Let's go home." Seeing that they were going out of the north door and knowing that he had just let Lucas out of the east door, he started to return in order to prevent any further trouble, but before he could reach the back door he heard a shot. It was stipulated that Mr. Wood, if present, would testify that he saw Garland step out of the door and that as he, Wood, turned to go back into the main building he saw Martinez pass the window, that evidently Martinez and Garland met at the door. Immediately after Garland went through the door he heard the report of a gun. Garland testified that he did not see Martinez until he opened the door and found him immediately in front of it. It is in evidence, as before stated, that the upper part of the double doors were of glass. Evidence of eye witnesses is to the effect that subsequent to the first shot two more shots were fired by Garland, Martinez having hold of Garland's arm and forcing it up so that the shots went into the air. The two fought and scuffled out onto the sidewalk and into the street and Garland either fell or was knocked down by Martinez who also fell down by the side of him. Garland had again dropped the gun or had it knocked from his hand and his nephew Stewart picked it up, and as Martinez attempted to get up Stewart shot him through the head. The record clearly discloses that there were four shots; that the second and third were fired into the air, and that Martinez was shot twice, one bullet entering the abdomen and the other going through his head, either of which wounds, it is stipulated, was fatal. It is apparent that it was the first shot fired by Garland, as he came out of the door, that entered Martinez' abdomen.

Garland testified, that in the second conflict Martinez was the aggressor. Taking into consideration the fact that Garland was armed; that he was the aggressor in the first altercation; that he himself was not a "potato bucker," and that the epithet which he resented was used by Martinez in boasting of his ability in that regard and was directed to a considerable number of persons standing about the store who had been engaged in similar work; that on the first occasion Martinez merely defended himself, that though he was "sore" because Garland had drawn a gun on him he left the store at the request of the clerk and started north in the direction of his home with the evident purpose of abandoning further controversy; that Mr. Lucero turned back when he saw Garland and his nephew about to leave through the back door because he feared further trouble; that Mr. Wood says that, looking through the window, he saw Martinez walking in a northerly direction just as he left Garland and Stewart, and that they and Martinez must have met at the door, which statement tends to negative any lying in wait by Martinez as suggested by the testimony of Garland; also there were windows in the upper part of the door through which he could have seen him had he been lying in wait. Considering further, that the shot was fired immediately after Garland went through the door, we think the circumstances were sufficient to authorize a submission to the jury of the question of whether Martinez or Garland was the aggressor in the second altercation, and if Martinez was the aggressor, the motive that prompted his being such. True, the altercation started in the recess leading from the sidewalk back to the door and Garland and Stewart were the only eye witnesses. Stewart was not available as a witness but Garland testified that Martinez was the aggressor. Both these men had been tried for murder and were acquitted. The incentive and the motive of men so situated when called as witnesses in another case in which their conduct which resulted in their prosecution for murder is in issue is to so testify

as to justify their actions and to uphold the. justice of their acquittal. It is very improbable that an unarmed man, who had not been the aggressor in the first altercation, but rather the victim of an unprovoked assault, would again attack a man whom he knew to be armed, after showing by his action in leaving that he had abandoned further controversy. We think the jury might well have found from the circumstances that when Martinez suddenly again was confronted with the man who had formerly assaulted him he thought he was again to be attacked. The circumstances need not be sufficient to negative the positive testimony of Garland that he was not the aggressor, for even if Martinez was the aggressor the jury might reasonably infer in the light of a situation well calculated to induce a reasonable man so situated to be apprehensive of danger, that in taking the aggressive he acted in self defense. Such evidence together with the apparent truthfulness or lack thereof in the testimony of Garland, with his strong motive to falsify his statements was sufficient to require a submission of the cause to the jury, and it was not error to deny defendant's motion for a directed verdict.

The judgment is affirmed.